# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| LEO ALPHONZO ALONSO-MEDINA | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

**FILED**

Feb 24, 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

Case No.     2:25-mj-0038 JDP

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____August 7, 2024_____ in the county of _____Solano_____ in the
_____Eastern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm and/or ammunition |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet and incorporated here by reference.

_____
/s/ Dalton Ryken
*Complainant's signature*

Dalton Ryken, FBI TFO
*Printed name and title*

Sworn to me and signed via telephone.

Date:    February 24, 2025

City and state:    Sacramento, California

_____
*Judge's signature*

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE AND UNDER RULE 4 FOR A WARRANT TO ARREST**

## I.    INTRODUCTION

I, TFO Dalton Ryken, being first duly sworn, hereby depose and state as follows:

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following people, premises, and property:

| Attachment | Target |
|---|---|
| A-1 | LEO ALPHONZO ALONSO-MEDINA ("**ALONSO-MEDINA**") |
| A-2 | CARLOS OSVALDO HIGUERA-ALDANA ("**HIGUERA-ALDANA**") |
| A-3 | 1202 Rollingwood Dr., Vallejo, CA 94591 (**"ALONSO-MEDINA's Residence"**) |
| A-4 | A 2002 Green Jaguar Sedan CA # 4ZIB649 ("**ALONSO-MEDINA's Vehicle #1**") |
| A-5 | A 2015 White Nissan Altima CA # 8ZSV733 (**ALONSO-MEDINA's Vehicle #2**) |
| A-6 | 1350 W F St., Dixon, CA 95620 (**"HIGUERA-ALDANA'S Residence #1"**). |
| A-7 | 301 Avian Dr., Apt. F32, Vallejo, CA 94590 (**"HIGUERA-ALDANA's Residence #2"**). |
| A-8 | A 2017 Black Chevy Silverado CA # 14698H2 ("**HIGUERA-ALDANA'S Vehicle #1**") |
| A-9 | A 2024 Gray Honda Accord CA # 9NZR358 ("**HIGUERA-ALDANA'S Vehicle #2**") |
| A-10 | A 2017 gray Nissan Maxima CA # 9RKA797 ("**HIGUERA-ALDANA'S Vehicle #3**") |
| A-11 | A 2019 gray Chevy Spark CA # 9RMY010 ("**HIGUERA-ALDANA'S Vehicle #4**") |

2.    These people and property are further described in Attachments A-1 through A-11.  The applications seek to search them for the things described in Attachment B-1 through B-11.  This affidavit also supports my application for arrest warrants of ALONSO-MEDINA and HIGUERA-ALDANA.

## II.    AGENT BACKGROUND

3.    Your affiant is Detective Dalton C. Ryken.  Your affiant is currently employed by the Solano County Sheriff's Office and has been since September of 2014.  Your affiant is currently

assigned as a Detective and Task Force Officer (TFO) with the U.S. Federal Bureau of Investigation's (FBI) Solano County Violent Crime Task Force (SCVCTF) and is dually sworn as a state and federal law enforcement officer.

4.      Your affiant's responsibilities include investigations pertaining to violent offenders and violent organizations.  These investigations frequently involve the possession and possession for sale of controlled substances and firearms, robberies, and homicides.  Your affiant is currently assigned to a task force which includes members from various local agencies as well as federal agents.  Part of your affiant's assignment is to assist local Solano County law enforcement partners with investigations involving violent acts and violent crime.

5.      Your affiant attended a six-month basic police officer academy at the Napa Valley Police Academy in Napa, California.  This training included over 20 hours of specialized training in controlled substances, which also included, but was not limited to, controlled substance identification, packaging, distribution, influence, and characteristics of use.  Your affiant has attended over 200 hours of formal training pertaining to controlled substances and controlled substance investigations.  I have arrested or assisted with the arrest of persons for possession of cocaine, cocaine base, crystal methamphetamine, marijuana, heroin, fentanyl, and MDMA.  I have contacted no less than 500 people who have been arrested for possession of controlled substance(s), possession of controlled substances for sale, and/or firearms possession.

6.      Your affiant has participated in discussion and informal training sessions with more experienced controlled substance agents regarding the methods used by controlled substance manufactures, traffickers, and users.  I regularly read controlled substance related literature to remain abreast of contemporary topics.  Your affiant has spoken with individuals who have admitted possessing controlled substances for sale and/or possessing controlled substances for personal use.  These individuals have discussed various topics surrounding controlled substances to include: packaging, pricing, use, manufacturing, methods of concealing, money laundering, transportation, protection, and the overall lifestyle and culture surrounding the illicit business.

7.      Your affiant has testified as an expert in Solano County Superior Court in cases involving the possession of methamphetamine, heroin, cocaine and fentanyl for sale.  As a Detective and TFO, I

have investigated cases involving possession of controlled substances and firearms for sale. Through these investigations, I have participated in numerous controlled buys of firearms and controlled substances.

8. Your affiant has participated in several investigations involving criminal gang activity within the county of Solano. I regularly meet with various Deputies and Detectives from the Solano County Sheriff's Office, other members of the FBI task force, and counterparts from other law enforcement agencies to share information regarding gang activity. I also regularly speak with gang members and their associates. I have attended various formal and informal training pertaining to gang activity and regularly review intelligence reports from federal, state, and local agencies regarding gang trends and activities

9. Your affiant was previously assigned to the Sheriff's Enforcement Team (SET). SET's responsibility and mission is the apprehension of fugitives and checking on the compliance of individuals on supervised release. During my time on SET, I conducted numerous controlled substance and firearms investigations. I authored and served various search warrants pertaining to controlled substances, firearms, and stolen property. I have worked with various bureaus within the Sheriff's Office, as well as various federal and state law enforcement agencies involving the investigations of various crimes.

10. Previously, while employed as a Deputy Sheriff, your affiant was assigned to the Solano County Sheriff's Office Patrol Bureau for a total of four years. During this time, your affiant made hundreds of arrests, conducted and participated in over a thousand criminal investigations relating to, but not limited to, homicides, assaults, domestic violence, robberies, burglaries, thefts, sexual assaults, stolen vehicles, possession of controlled substances for sale, firearms possession, gang participation, and missing persons. These investigations consisted of interviewing witnesses, victims, and possible leads; locating and gathering evidence; apprehending criminal suspects and violators of the law; preparing and processing all necessary reports; and testifying as a witness in court.

11. Prior to becoming a Deputy Sheriff, your affiant graduated from California State University Sacramento in 2012 with a Bachelor of Science Degree in Criminal Justice. During my studies, I attended and completed courses relating to criminal investigations of the following: crimes

against persons; crimes against property; narcotics; gangs; and firearms related offenses.

12.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

13.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846—conspiracy to distribute and possess with intent to distribute controlled substances—have been committed by LEO ALPHONZO ALONSO-MEDINA (**ALONSO-MEDINA**) and CARLOS OLVALDO HIGUERA-ALDANA (**HIGUERA-ALDANA**).  In addition, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1)—felon in possession of firearms or ammunition—have been committed by **ALONSO-MEDINA**.  Collectively the violations described above will be referred to as the "TARGET OFFENSES."  There is also probable cause to search the people and property described in Attachments A-1 through A-11 for evidence and instrumentalities of these crimes further described in Attachments B-1 through B-11.

## II.     <u>PROBABLE CAUSE</u>

14.     The United States Government, and the FBI specifically, is investigating LEO ALONSO-MEDINA, CARLOS HIGUERA-ALDANA**,** JEREMIAH SALANOA, DOROTEO SUASTEGUI, DAVION MORGAN, and other members of a Vallejo Subset Sureno street gang "Brown Brotherhood," commonly referred to as BBH, for suspected firearms and controlled substance trafficking in the Eastern District of California.

15.     There are at least two active Sureno gangs in the city of Vallejo.  They are Brown Brotherhood (BBH) and Brown Crowd Locos (BCL).  Many BBH and BCL claim Westside Vallejo (WSV), meaning, they claim the west side of the city as their territory or area of operation.  Whereas, a rival gang, the Nortenos, claim East Side Vallejo (ESV) as their territory.

16.     BBH is one of the oldest and largest criminal street gangs within the city of Vallejo.  BBH was first noticed by the Vallejo Police Department in 1991.  BBH is comprised primarily of

Hispanic males, although individuals of other races are accepted.  BBH is a Sureno criminal street gang as they wear the color blue, utilize the number 13, and answer to the Mexican Mafia (La Eme).  BBH has a "click," or group within the gang, called West Side Pee Wees (WSP).  This click was created to show respect to Israel Balderas (Rivera) (aka Pee Wee), a BBH gang member who was sentenced to prison for a gang related homicide in 2007.  BBH members will get tattoos and tag their belongings and other property with things such as: SUR, 13, XIII, X3, 3 dots, South Sider, West Side Vallejo, WSV, West Side, WS, WSP, 228, and BBH.  BBH gang members, BCL gang members, and other Surenos from the surrounding cities and counties have been seen cooperating and socializing together.

17.    Primary criminal activities of Sureno gang members have included murder, robbery, extortion, drug trafficking, firearms trafficking, burglary, stolen vehicles, and victim/witness intimidation.  These criminal acts, in association with, or at the direction of older gang members (also known as "OG's"), are meant to instill fear and intimidation in rival gang members, as well as members of the community who live and work in the neighborhoods controlled by the gang.  Solano County law enforcement agencies, including the Vallejo Police Department and the Solano County Violent Crime Task Force (SCVCTF), have conducted numerous investigations surrounding BBH and BBH gang members.  These investigations have led to arrests and/or convictions of various members for crimes including but not limited to drug sales, felony assaults, firearms trafficking, firearm possession and murder.

18.    SCVCTF is currently working with a Confidential Human Source (CHS).[1]  The CHS has provided information on various BBH gang members and has conducted multiple controlled firearm or drug purchases from various BBH members.  This investigation began in February 2024 and has been ongoing since.

19.    At the start of this investigation, the CHS reported that Leo **ALONSO-MEDINA**, a.k.a

---

[1]  The CHS started cooperating with the FBI in order to avoid prosecution from a state arrest.  The CHS has since fulfilled his/her commitment to law enforcement and continued to cooperate with the FBI for monetary compensation.  The CHS has requested the FBI's assistance with his/her immigration status in the U.S. should it be needed in the future.  However, no assistance with the CHS' immigration status has been provided to the CHS thus far.  The CHS has no criminal convictions.  The CHS has been arrested, but not convicted, for the following offenses: possession of a concealed firearm in a vehicle.  The CHS has been an informant for the FBI since August 2022 and has been proven to be a reliable CHS thus far.  The CHS' reporting has been proven to be truthful and has been independently verified by FBI agents.

"Clowny," was a BBH gang member who sold firearms and controlled substances. **ALONSO-MEDINA** was incarcerated at the start of the investigation. **ALONSO-MEDINA** has a considerable criminal history in Solano County and record of gang participation dating back to 2015. A check of **ALONSO-MEDINA's** criminal history revealed he has the following felony convictions: a 2016 felony conviction for California Penal Code (PC) § 30605(a), Possession of any Assault Weapon; a 2016 felony conviction for California PC § 186.22(a), Participating in a Criminal Street Gang; a 2023 felony conviction for California PC § 29800(a)(1), Felon in Possession of a Firearm; and a 2023 conviction for California PC § 1320.2, Failure to Appear for a Felony Charge with a prior Felony Conviction. Some of **ALONSO-MEDINA's** notable arrests include: California PC § 246.3, Willful Discharge of a Firearm in a Negligent Manner; California PC § 26100(d), Discharge of a Firearm from a Vehicle; California PC § 245(b), Assault on Person with Semi-Automatic Firearm; and California PC § 25850(a), Carrying a Loaded Firearm in Public Place. **ALONSO-MEDINA** was released from the California Department of Corrections and Rehabilitation (CDCR) in May 2024 on a grant of Post Release Community Supervision (PRCS).



*Photo of Leo ALONSO-MEDINA AKA "Clowny"*

20.    In June 2024, after **ALONSO-MEDINA's** release from prison, the CHS reported that **ALONSO-MEDINA** offered to supply the CHS with cocaine. The CHS reported that on June 30, 2024, the CHS was with **ALONSO-MEDINA**. The CHS had been previously tasked with attempting to set

up a controlled drug or firearm purchase from **ALONSO-MEDINA**.  On this day, **ALONSO-MEDINA** had an Instagram conversation with Israel RIVERA aka "Pee Wee" in the CHS' presence.  RIVERA was incarcerated in California State Prison and was in possession of a contraband phone.  The Instagram conversation took place from **ALONSO-MEDINA's** Instagram account "wsv.13" and RIVERA's Instagram account "israelrivera417."  Throughout the conversation, RIVERA advised **ALONSO-MEDINA** that he could supply one kilogram of cocaine for $14,000 or one half a kilogram of cocaine for $7,500.  RIVERA advised that once the CHS and **ALONSO-MEDINA** agreed on an amount and location for the buy, RIVERA would have someone deliver the cocaine.

21.    On July 12, 2024, the CHS communicated with **ALONSO-MEDINA** via Snapchat.  The CHS advised **ALONSO-MEDINA's** Snapchat account was "Leoalonso8417."  **ALONSO-MEDINA** offered to contact RIVERA and order a half kilogram of cocaine for $8,000 for the CHS.  **ALONSO-MEDINA** told the CHS he would facilitate the deal for a $500 fee.

22.    On July 14, 2024, **ALONSO-MEDINA** told the CHS that RIVERA confirmed that he would be able to supply the half kilogram of cocaine.  The buy was set for July 16, 2024.

23.    On July 15, 2024, **ALONSO-MEDINA** told CHS that RIVERA was unable to put together the deal.  RIVERA had offered to send some "samples" in the future, but the desired quantity of cocaine could not be arranged at this time.  **ALONSO-MEDINA** told the CHS his friend and fellow BBH gang member "Locs" would be able to make the deal happen.  "Locs" was identified as "Carlos," who was going to get the cocaine from the Los Angeles area and would be back in Vallejo around 10 AM on July 16, 2024.  The CHS later confirmed that due to the way **ALONSO-MEDINA** speaks, it was unclear if **ALONSO-MEDINA** was referring to Carlos as "Locs" or "Los."  **ALONSO-MEDINA** updated the CHS that "Carlos" only had a quarter of a kilo of cocaine which could be provided to CHS for $3,750.  **ALONSO-MEDINA** was to be paid $250 for setting up the deal totaling $4,000.

*Controlled buy of quarter kilogram of cocaine from ALONSO-MEDINA*

24.    On July 16, 2024, SCVCTF through the CHS conducted a controlled buy/walk operation for the agreed upon quarter kilogram of cocaine from **ALONSO-MEDINA**.  Prior to the buy, the CHS and the CHS' vehicle were searched for contraband with negative results.  The CHS was provided $4,000 of FBI buy funds.  In summary, the CHS met with **ALONSO-MEDINA** in the carport of 121

Maher Ct., which was the residence of BBH gang member Doroteo SUASTEGUI. **ALONSO-MEDINA** had been provided the agreed upon cocaine from "Carlos" prior to the CHS' arrival at the buy location. **ALONSO-MEDINA** told CHS the supplier had additional drop offs to make. The CHS paid the $4,000 directly to **ALONSO-MEDINA** in exchange for the quarter kilogram of cocaine. **ALONSO-MEDINA** was going to provide the money—$3,750—to the cocaine supplier—Carlos—later in the day.

25.    The CHS returned to meet with CHS handlers under constant surveillance and the quarter kilogram cocaine was recovered. The CHS and CHS' vehicle were again searched for unauthorized contraband or money with negative results. The United States Department of Justice Western Laboratory later analyzed the suspected cocaine sold by **ALONSO-MEDINA**. On October 10, 2024, the Western Laboratory confirmed the substance was Cocaine Hydrochloride with a purity of approximately 90% and with a net weight of approximately 250.1 grams.



*Photo of quarter kilogram of cocaine recovered from controlled buy/walk*

26.    After the controlled buy, physical surveillance was conducted on **ALONSO-MEDINA**. **ALONSO-MEDINA** returned to 1202 Rollingwood Dr. in Vallejo (**"ALONSO-MEDINA's Residence"**) and entered via the side gate located along Oakmore Ct. at 1450 hours. A white Toyota

Prius with California license plate 7LMY633 arrived at **ALONSO-MEDINA's Residence**. and parked facing east on Oakmore Ct. across the street from the garage.  A Hispanic Male Adult (HMA) exited the driver seat of the Prius and entered the side gate located along Oakmore Ct.  The HMA was later identified as Carlos **HIGUERA-ALDANA**.  At 1456 hours, **ALONSO-MEDINA** and **HIGUERA-ALDANA** were observed by TFO Shane Raftery exiting the side yard together.  **HIGUERA-ALDANA** entered the driver seat of the Prius and left the area.  **ALONSO-MEDINA** returned to the residence.  Rolling surveillance was briefly conducted on the Prius.  The Prius turned onto Avian Dr. and surveillance was terminated.

27.     A DMV records check of the Prius returned as registered to **HIGUERA-ALDANA**.  Investigators obtained a photo of the registered owner and identified **HIGUERA-ALDANA** as the driver of the Prius on the day of this operation.  The investigation indicated "Carlos" was likely going to be the source of supply for **ALONSO-MEDINA**.  The Prius was captured on an Automatic License Plate Reader (ALPR) camera(s) in very close proximity to Maher Ct. just prior to when **ALONSO-MEDINA** advised the supplier was at the buy location.  The Prius was again captured on ALPR leaving the area of Maher Ct. shortly after.  **HIGUERA-ALDANA** and the Prius were observed at **ALONSO-MEDINA**'s residence and stayed for a short time.  Your affiant recognized this short term stay to be consistent with narcotic sales activity as the exchange of money and controlled substance(s) is often done quickly.  Based on these facts and circumstances, your affiant concluded **HIGUERA-ALDANA** likely supplied **ALONSO-MEDINA** with cocaine on the day of the operation.

28.     Your affiant has maintained an undercover (UC) Instagram throughout the course of his duties.  Your affiant has followed the Instagram "VTOWN_LOS200" for some time.  Your affiant has observed the account holder post photos and videos to the Instagram story and highlights frequently.  I recognized the photos and videos on the account to be of **HIGUERA-ALDANA**.  A screenshot of an Instagram highlight from the account is below along with **HIGUERA-ALDANA**'s CalPhoto:

 

"VTOWN_LOS200" INSTAGRAM SCREENSHOT          HIGUERA-ALDANA CALPHOTO

29.　　It should be noted, it appeared to your affiant that **HIGUERA-ALDANA** was wearing a photo medallion in the above photo.  I recognized the photo which appeared to be of Daniel CHAVEZ, aka "Big Boy," a BBH Sureno who was murdered in Vallejo in 2020.  The photo was posted to the Instagram highlight on March 29, 2023, which was the day after CHAVEZ's birthday.  Further, **HIGUERA-ALDANA** used the numerals "200" in his Instagram username "VTOWN_LOS200."  Your affiant is aware that BBH Surenos claim the intersection of Arkansas St. and Marin St. as their territory.  This corner is in the 200 block of Arkansas St.  Other BBH members have used 200 in their Instagram usernames consistent with their membership or affiliation to BBH.

30.　　On July 17, 2024 at approximately 2138 hours, your affiant located **HIGUERA-ALDANA's** Toyota Prius with California license plate 7LMY633 parked and backed into the driveway of 806 Sheridan St. in Vallejo.  At 2232 hours, your affiant observed the Toyota backed into the driveway of 1350 W F St. in Dixon (**HIGUERA-ALDANA's Residence #1**).  Your affiant observed **HIGUERA-ALDANA** standing in the driveway next to the Prius.

31.　　On July 18, 2024, at approximately 0820 hours, your affiant observed **HIGUERA-ALDANA's** Prius parked and backed into the driveway of **HIGUERA-ALDANA's Residence #1.**

32.    On July 23, 2024, at approximately 0740 hours, your affiant observed **HIGUERA-ALDANA's** Prius parked and backed into the driveway of **HIGUERA-ALDANA's Residence #1**. Parked next to the Prius in the driveway was a black 2017 Chevy Silverado with California license plate 14698H2 (**HIGUERA-ALDANA's Vehicle #1**) which returned registered to **HIGUERA-ALDANA**.

### Controlled buy of two firearms from ALONSO-MEDINA

33.    On August 7, 2024, SCVCTF through the CHS conducted a controlled buy/walk operation. **ALONSO-MEDINA** was the target of the buy/walk. **ALONSO-MEDINA** agreed to sell the CHS two firearms in exchange for $2.600. Prior to the buy, the CHS and the CHS' vehicle were searched for contraband with negative results. The CHS was provided $4,000 of ATF buy funds. In summary, the CHS met with **ALONSO-MEDINA** in front of **ALONSO-MEDINA's Residence.** **ALONSO-MEDINA** exited the side gate of the residence adjacent to the garage with the two firearms and entered the CHS' vehicle. **ALONSO-MEDINA** provided the CHS with a black Smith and Wesson .45 caliber handgun with serial number HUK3752. The Smith and Wesson had a magazine inserted into the magazine well which contained four live rounds of ammunition. **ALONSO-MEDINA** also provided the CHS with a .40 caliber Glock style Privately Made Firearm (PMF) with a green slide, black lower receiver and black grips. The PMF came with an extended magazine that was not inserted into the magazine well. The extended magazine contained 15 rounds of live .40 caliber Winchester ammunition. The CHS paid the $2,600 directly to **ALONSO-MEDINA** in exchange for the two firearms. The CHS returned the remaining $1,400 to agents at the end of the operation. The CHS was under constant surveillance during the operation. The CHS and the CHS' vehicle were searched for unauthorized contraband with negative results.



*Photo of firearms recovered from controlled buy/walk*

34.     On August 8, 2024, **ALONSO-MEDINA** told the CHS he was planning on purchasing a black AK-47 style firearm. On August 9, 2024, **ALONSO-MEDINA** sent the CHS pictures of the AK-47 via Snapchat. **ALONSO-MEDINA** told the CHS he had a new firearm supplier. **ALONSO-MEDINA** asked the CHS to try and find a buyer for the AK-47. **ALONSO-MEDINA** told the CHS he would sell the AK-47 with accessories for $3,200.

35.     **ALONSO-MEDINA** had been using cellular telephone number 707-608-8523 at this point in the investigation. Special Agent (SA) Nathan Cernat authored a cell phone ping warrant for 707-608-8523 which was signed by this court on August 16, 2024 (2:24-SW-0797). SA Cernat began receiving GPS ping data shortly after the warrant was served.

### *Shooting of Marked Vallejo Patrol Vehicle*

36.     On August 17, 2024, at approximately 0101 hours, Vallejo Police Department (VPD) Officer Pablo LOPEZ and Officer Clinton HILL were doubled up in a marked Vallejo Police Department patrol vehicle in the area of Tennessee St. and Mare Island Way. The VPD Officers heard

what they recognized to be gunfire nearby.  As they turned southbound onto Mare Island Way, the VPD patrol vehicle was struck several times by gunfire.  Neither Officer was struck by the gunfire and vehicles began to flee the waterfront parking lots located around 42 Harbor Way in Vallejo.

37.     VPD investigated the shooting and discovered that two groups had engaged in a shootout in the parking lot of 42 Harbor Way.  One group was suspected to be BBH gang members.  A shootout began between the BBH group and the other group and vehicles began to flee the area.  One individual from the BBH group continually shot at one of the fleeing vehicles with a rifle.  During this volley of gunfire, the VPD patrol car was struck either intentionally or unintentionally.  Multiple various caliber casings were located on scene to include 7.62 caliber ammunition which is associated to the AK-47 style firearm.  VPD identified several suspects and executed residential search warrant(s).  BBH gang member Orlando RUIZ, aka "Happy," was arrested for California PC § 32, Accessory after the Fact.



*Photos of VPD patrol vehicle struck by gunfire*

38.     Following the VPD patrol car being struck by gunfire, SA Cernat reviewed the GPS ping data from **ALONSO-MEDINA's** cell phone, which was received pursuant to the search warrant.  SA Cernat observed **ALONSO-MEDINA's** cell phone plotted in the area of 42 Harbor War during the time of the shooting.

39.     On August 18, 2024, **ALONSO-MEDINA** called the CHS and told the CHS he needed to get rid of the AK-47.  **ALONSO-MEDINA** told the CHS he would drop the price from $3,200 to $2,000.  **ALONSO-MEDINA** told the CHS the AK-47 was "clean" but recently "used."  The CHS was instructed to arrange to buy the AK-47 on August 19, 2024.  **ALOSNO-MEDINA** told the CHS that

BBH gang member Davion MORGAN, aka "Scrappy," had the AK-47 and would meet the CHS to complete the transaction.  **ALONSO-MEDINA** provided MORGAN's cell phone number (707-384-8320) to the CHS.  **ALONSO-MEDINA** told the CHS he would not be present for the transaction.



*BBH gang members, Davion MORGAN "Scrappy" (left) ALONSO-MEDINA "Clowny" (center).*

### Controlled buy of AK-47 from ALONSO-MEDINA

40.     On August 19, 2024, SCVCTF through the CHS conducted a controlled buy/walk operation.  **ALONSO-MEDINA** and Davion MORGAN were the targets of the buy/walk.  **ALONSO-MEDINA** agreed to sell the CHS the AK-47 firearm in exchange for $2,000.  Prior to the buy, CHS and the CHS vehicle were searched for contraband with negative results.  The CHS was provided $5,000 of ATF buy funds.  Prior to the buy, a white Honda Accord bearing California temporary plate CG80J56 was observed in the driveway of 503 Kinglet Ct., Suisun City.  At 1937 hours, CHP Investigator Eric Hulbert observed MORGAN exit the residence and enter the Honda.  MORGAN drove to the buy

location.  In summary, CHS met with MORGAN in the parking lot of the Suisun City Walmart located at 350 Walters Rd. in Suisun City.  The CHS entered MORGAN's Honda and paid the $2,000 directly to MORGAN in exchange for the AK-47 firearm.  The CHS returned the remaining $3,000 to agents at the end of the operation.  The CHS and the CHS' vehicle were searched for unauthorized contraband with negative results.  The CHS was under constant surveillance during the operation. The firearm was a Saiga 7.62X39 AK-47 style rifle with an obliterated serial number.  The firearm had no magazine inserted into the magazine well but was sold with two AK-47 style magazines.  One magazine contained 2 rounds of 7.62 caliber ammunition.



*Photo of AK-47 style firearm purchased from ALONSO-MEDINA via MORGAN*

41.    ATF SA Daniel BIETZ took custody of the AK-47 firearm as evidence.  The AK-47 was test fired and a casing was submitted to National Integrated Ballistics Information Network (NIBIN). On August 21, 2024, your affiant received a NIBIN lead notification from SA Bietz.  The NIBIN lead asserted a potential that the AK-47 was the same firearm used in the shooting in which the VPD vehicle was struck.  In summary, the casings recovered at the scene of the shooting and the casings from the AK-47 test fire were both likely shot from the AK-47 purchased from **ALONSO-MEDINA**.

*Controlled buy of one pound of methamphetamine from ALONSO-MEDINA*

42.    On August 27, 2024, SCVCTF through the CHS conducted a controlled buy/walk operation.  **ALONSO-MEDINA** was the target of the buy/walk.  **ALONSO-MEDINA** agreed to sell the CHS one pound of methamphetamine in exchange for $1,100.  Prior to the buy, CHS and the CHS' vehicle were searched for contraband with negative results.  The CHS was provided $2,200 of FBI buy funds.  Prior to the buy, **ALONSO-MEDINA** texted the address of the buy location to the CHS.  The buy location was 850 Louisiana St. in Vallejo.  The CHS drove to 850 Louisiana St.  **ALONSO-MEDINA** exited the front door of the residence and walked to the CHS' vehicle.  **ALONSO-MEDINA** entered the passenger seat of the CHS' vehicle.  **ALONSO-MEDINA** provided the CHS the pound of suspected methamphetamine in exchange for the $1,100.  The CHS drove **ALONSO-MEDINA** to **ALONSO-MEDINA's Residence**.  The CHS returned the remaining $1,100 to agents at the end of the operation.  The CHS and the CHS' vehicle were searched for unauthorized contraband with negative results.  The United States Department of Justice Western Laboratory later analyzed the suspected methamphetamine sold by **ALONSO-MEDINA**.  On October 3, 2024, the Western Laboratory confirmed the substance was methamphetamine with a purity of approximately 100% and with a net weight of approximately 446.6 grams.

1
2
3
4
5
6
7
8
9
10
11
12
13



*Photo of methamphetamine recovered from buy/walk*

14    43.    The Instagram username "VTOWN_LOS200" was identified to be **HIGUERA-**

15  **ALDANA's** Instagram account by the CHS and your affiant.  "WSV.13_CLOWNY" was identified by

16  the CHS to be **ALONSO-MEDINA's** Instagram account.  Your affiant authored a search warrant for

17  both the Instagram accounts which was signed by this Court on August 1, 2024 (2:24-sw-0761).  Your

18  affiant reviewed the Instagram return which was provided by Meta.  Your affiant observed several

19  conversations throughout the Meta platforms business record of the "VTOWN_LOS200" account which

20  were consistent with **HIGUERA-ALDANA's** involvement in the sale of various controlled substances.

21  Specifically, your affiant observed a message thread between **HIGUERA-ALDANA** and **ALONSO-**

22  **MEDINA** on July 16, 2024, which was consistent with the timeline of events of the controlled cocaine

23  buy, further substantiating that **HIGUERA-ALDANA** provided the quarter kilogram of cocaine to

24  **ALONSO-MEDINA**.

25    44.    On September 10, 2024, SCVCTF through CHS attempted a controlled buy operation of

26  two pounds of methamphetamine from **ALONSO-MEDINA**.  During the operation, surveillance was

27  set at 806 Sheridan St. in Vallejo.  During the operation, **HIGUERA-ALDANA** was observed exiting

28  the upstairs apartment door, apartment B, of 806 Sheridan St. and enter a gray 2024 Honda Accord with

California license plate 9NZR358 (**HIGUERA-ALDANA's Vehicle #2**); at the time of the attempted operation the Honda was affixed with a temporary license plate which has since been replaced with the true permanent plate. The Honda returned registered to **HIGUERA-ALDANA**. During the surveillance, your affiant located a green 2002 Jaguar sedan with California license plate 4ZIB649 (**ALONSO-MEDINA's Vehicle #1**) parked on the street in front of 230 El Sendero in Vallejo. The CHS had previously reported that **ALONSO-MEDINA** had been driving **ALONSO-MEDINA's Vehicle #1**. At 1749 hours, **ALONSO-MEDINA** arrived at 230 El Sendero in the passenger seat of a Ford Edge which was observed by your affiant. **ALONSO-MEDINA** entered the driver seat of **ALONSO-MEDINA's Vehicle #1. ALONSO-MEDINA** drove to **ALONSO-MEDINA's Residence** and entered through the front door. **ALONSO-MEDINA** was ultimately unable to source the methamphetamine on this day, and the controlled buy was cancelled.

45.     Following the controlled buy attempt, SA Cernat and your affiant instructed the CHS to attempt to reach out directly to **HIGUERA-ALDANA** to attempt to arrange a future purchase of methamphetamine directly from **HIGUERA-ALDANA** without having to use **ALONSO-MEDINA** as a middleman. The CHS direct Instagram messaged **HIGUERA-ALDANA** at his new Instagram account "VTOWN_LOS." **HIGUERA-ALDANA** and the CHS got in contact via Instagram and **HIGUERA-ALDANA** and the CHS exchanged phone numbers. **HIGUERA-ALDANA's** phone number was 925-584-8463. The CHS and **HIGUERA-ALDANA** discussed a future methamphetamine deal. **HIGUERA-ALDANA** told the CHS that the methamphetamine cost $1,000 per pound. The CHS asked **HIGUERA-ALDANA** if any money needed to be provided to **ALONSO-MEDINA**. **HIGUERA-ALDANA** advised the CHS that the CHS could provide some money to **ALONSO-MEDINA** if the CHS desired to, but it was not necessary for the deal.

*Controlled buy of two pounds of methamphetamine from HIGUERA-ALDANA*

46.     On September 17, 2024, SCVCTF through the CHS conducted a controlled buy/walk operation of two pounds of methamphetamine from **HIGUERA-ALDANA**. SA Cernat and your affiant met the CHS at a pre-determined meeting location. The CHS and the CHS' vehicle were searched for contraband with negative results. The CHS was provided $2,000 of FBI buy funds. The CHS called

1  **HIGUERA-ALDANA** at 925-584-8463.  **HIGUERA-ALDANA** told the CHS to go to 806 Sheridan

2  St.  **HIGUERA-ALDANA** advised he would soon be leaving but **HIGUERA-ALDANA's** "brother"

3  was at the house and he would bring the methamphetamine out to the CHS when the CHS arrived.

4        47.    TFO Shane Raftery observed **HIGUERA-ALDANA** exit the upstairs apartment of 806

5  Sheridan St. and enter **HIGUERA-ALDANA's Vehicle #2**.  **HIGUERA-ALDANA** left the area in

6  **HIGUERA-ALDANA's Vehicle #2**.  CHS departed the meeting location followed by SA Cernat and

7  your affiant.  The CHS arrived in front of 806 Sheridan St. and called **HIGUERA-ALDANA**.  The CHS

8  told **HIGUERA-ALDANA** that the CHS was out front.  **HIGUERA-ALDANA** advised he would call

9  his "brother" who would bring the methamphetamine out to the CHS.  Shortly after the CHS hung up

10  the phone, TFO Raftery observed an unknown young HMA exit the upstairs apartment of 806 Sheridan

11  St. from the same door that HIGUERA-ALDANA had exited.  The unknown HMA was carrying a white

12  grocery bag.  The unknown HMA provided the bag to the CHS and the CHS provided the $2,000 of FBI

13  buy funds to the unknown HMA.  The unknown HMA counted the money and went back upstairs to 806

14  Sheridan St.  The CHS returned to the meeting location followed by SA Cernat and your affiant.

15        48.    SA Cernat and your affiant recovered the two pounds of suspected methamphetamine,

16  which was provided to the CHS in a white "Winco" grocery bag.  The CHS and the CHS' vehicle was

17  searched for unauthorized contraband with negative results.  The United States Department of Justice

18  Western Laboratory later analyzed the suspected methamphetamine sold by **HIGUERA-ALDANA**.  On

19  October 28, 2024, the Western Laboratory confirmed the substance was methamphetamine with a purity

20  of approximately 99% and with a net weight of approximately 890.7 grams.

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11



*PHOTO OF SUSPECTED METHAMPHETAMINE PROVIDED BY HIGUERA-ALDANA.*

12      49.    Throughout the investigation, your affiant has conducted surveillance at various locations

13  associated to **HIGUERA-ALDANA**.  The locations include but are not limited to: 806 Sheridan St. and

14  **HIGUERA-ALDANA's Residence #1,** located at 1350 W F St., Dixon.  Your affiant has observed

15  **HIGUERA-ALDANA's Vehicle #1** and **HIGUERA-ALDANA's Vehicle #2** parked at both addresses

16  on various occasions.

17      50.    Your affiant authored a vehicle tracker warrant for **HIGUERA-ALDANA's Vehicle #2**

18  which was signed by this Court on September 24, 2024 (2:24-sw-0917).  The warrant was served on

19  September 25, 2024 and expired on October 25, 2024.

20      51.    On October 3, 2024, SA Nathan Cernat conducted surveillance of **HIGUERA-**

21  **ALDANA's Residence #1**.  SA Cernat observed **HIGUERA-ALDANA's Vehicle #1** parked on the

22  street in front of the residence.  SA Cernat observed **HIGERA-ALDANA** exit the area of the front door

23  of the residence and walk to **HIGUERA-ALDANA's Vehicle #1**.  **HIGUERA-ALDANA** opened the

24  driver door of the **HIGUERA-ALDANA's Vehicle #1** and briefly leaned inside**.  HIGUERA-**

25  **ALDANA** returned to the area of the front door of **HIGUERA-ALDANA's Residence #1**.

26  **HIGUERA-ALDANA** later exited the residence with what appeared to be laundry.  **HIGUERA-**

27  **ALDANA** placed the items back into the **HIGUERA-ALDANA's Vehicle #1**.  **HIGUERA-ALDANA**

28  returned to the residence through the open garage door.  The garage door closed behind **HIGUERA-**

1    ALDANA.  **HIGUERA-ALDANA** later exited the area of the front door and entered **HIGUERA-**

2    **ALDANA's Vehicle #1** as the sole occupant.  **HIGUERA-ALDANA** departed west on W F St. in

3    Dixon and surveillance was terminated.

4          52.    On October 4, 2024, **HIGUERA-ALDANA** contacted the CHS via text message.

5    **HIGUERA-ALDANA** texted the CHS from 707-294-4006.  **HIGUERA-ALDANA** advised the CHS

6    that he had gotten a new phone number.

7          53.    Your affiant authored a vehicle tracker warrant for **HIGUERA-ALDANA's Vehicle #1**

8    which was signed by this Court on October 9, 2024 (2:24-sw-0973).  The warrant was served on

9    October 10, 2024 and has since expired.

10

11             ***Controlled buy of two pounds of methamphetamine from HIGUERA-ALDANA***

12         54.    On October 23, 2024, SCVCTF through the CHS conducted a controlled buy/walk

13   operation of two pounds of methamphetamine from **HIGUERA-ALDANA**.  SA Cernat and your affiant

14   met the CHS at a pre-determined meeting location.  The CHS and the CHS' vehicle were searched for

15   contraband with negative results.  The CHS was provided $2,000 of FBI buy funds.

16         55.    Prior to the controlled buy, **HIGUERA-ALDANA's Vehicle #2** was located at the

17   Huckleberry's restaurant located at 800 Southampton, Benicia.  **HIGUERA-ALDANA** was observed in

18   the parking lot of the restaurant.  **HIGUERA-ALDANA** got into **HIGUERA-ALDANA's Vehicle #2**.

19   **HIGUERA-ALDANA** drove to 806 Sheridan St. and exited **HIGUERA-ALDANA's Vehicle #2** and

20   entered the upstairs apartment of 806 Sheridan St., apartment B.

21         56.    CHS departed the meeting location followed by SA Cernat and your affiant.  The CHS

22   arrived in front of 806 Sheridan St. and called **HIGUERA-ALDANA**.  **HIGUERA-ALDANA**

23   confirmed with the CHS that the order was for "two waters."  Throughout this investigation,

24   **HIGUERA-ALDANA** has used the term "water" to refer to a pound of methamphetamine.  During the

25   two prior controlled methamphetamine purchases, **HIGUERA-ALDANA** referred to two pounds of

26   methamphetamine as "two waters."  Your affiant is familiar with the term "waters" to describe pounds

27   of methamphetamine and has observed this term used in prior investigations.  The CHS confirmed the

28   order and **HIGUERA-ALDANA** exited the upstairs apartment of 806 Sheridan St. with a white "7

Eleven" plastic bag.  **HIGUERA-ALDANA** met with the CHS, who was parked out front in the CHS'

vehicle.  **HIGUERA-ALDANA** handed the CHS the white "7 Eleven" shopping bag which contained

the agreed upon two pounds of suspected methamphetamine.  The CHS gave **HIGUERA-ALDANA** the

$2,000 of buy funds.  **HIGUERA-ALDANA** counted the money while leaning into the CHS vehicle

through the passenger window.  The CHS returned to the meeting location, followed by SA Cernat and

your affiant.

57.    SA Cernat and your affiant recovered the two pounds of suspected methamphetamine

which was provided to the CHS in a white "7 Eleven" grocery bag.  The CHS and the CHS' vehicle was

searched for unauthorized contraband with negative results.  The United States Department of Justice

Western Laboratory later analyzed the suspected methamphetamine sold by **HIGUERA-ALDANA.**  On

November 29, 2024, the Western Laboratory confirmed the substance was methamphetamine with a

purity of approximately 98% and with a net weight of approximately 890.7 grams.



"7 ELEVEN" BAG AND METHAMPHETAMINE.



PHOTO OF RECOVERED METHAMPHETAMINE.

58.     Following the controlled buy/walk operation, your affiant authored vehicle tracker warrants for **HIGUERA-ALDANA's Vehicle # 1** and **HIGUERA-ALDANA's Vehicle # 2**.  The warrants were signed by this Court on October 29, 2024 (2:24-sw-1030 and 2:24-sw-1031).  The warrants were served on October 29, 2024 and expired on December 13, 2024.

59.     On November 19, 2024, SCVCTF and Solano County Sheriff's Office Detectives conducted surveillance on **HIGUERA-ALDANA** and his associated vehicles.  Your affiant utilized the vehicle trackers affixed to the vehicles to assist with the surveillance, all times are approximate.

60.     At 1033 hours, your affiant observed the tracker affixed to **HIGUERA-ALDANA's Vehicle # 1** GPS plot in the parking lot of Kaiser Permanente, located at 1 Quality Dr. in Vacaville.  At 1055 hours, your affiant and SA Cernat observed an unknown HMA sitting in the driver seat of **HIGUERA-ALDANA's Vehicle # 1**.  The unknown HMA was later identified as Angel Jesus LOPEZ-PIMENTEL.  At 1057 hours, your affiant observed **HIGUERA-ALDANA** walk towards **HIGUERA-ALDANA's Vehicle # 1** from the area of the Kaiser emergency room.  **HIGUERA-ALDANA** entered the passenger side of **HIGUERA-ALDANA's Vehicle # 1**.  **HIGUERA-ALDANA's Vehicle # 1** departed the Kaiser Permanente parking lot at 1058 hours.

61.     At 1112 hours, your affiant utilized the tracker data to locate **HIGUERA-ALDANA's Vehicle # 1** parked on the street in front of **HIGUERA-ALDANA's Residence # 1**.  **HIGUERA-ALDANA's Vehicle # 2** was parked on the street in front of **HIGUERA-ALDANA's Vehicle # 1**.  At 1116 hours, your affiant observed **HIGUERA-ALDANA** exit the area of the front door of **HIGUERA-ALDANA's Residence #1** and enter the driver seat of **HIGUERA-ALDANA's Vehicle # 2**. LOPEZ-

1   PIMENTEL walked from **HIGUERA-ALDANA's Vehicle # 1** to the driver door of **HIGUERA-**

2   **ALDANA's Vehicle # 2**.  **HIGUERA-ALDANA** appeared to hand LOPEZ-PIMENTEL something

3   from the driver seat of **HIGUERA-ALDANA's Vehicle # 2**.  LOPEZ-PIMENTEL returned to

4   **HIGUERA-ALDANA's Vehicle # 1**.  At 1117 hours, **HIGUERA-ALDANA's Vehicle # 1,** driven by

5   LOPEZ-PIMENTEL and **HIGUERA-ALDANA's Vehicle # 2**, driven by **HIGUERA-ALDANA**

6   departed the residence in tandem and turned northbound onto Pitt School Rd. in Dixon.

7          62.     On December 4, 2024, your affiant and SA Cernat deployed a video surveillance vehicle

8   in the area of **ALONSO-MEDINA's Residence**.  SA Cernat reviewed the footage and from December

9   4, 2024 through December 12, 2024, SA Cernat observed **ALONSO-MEDINA** enter and exit

10  **ALONSO-MEDINA's Residence** several times throughout the week.  On December 5, 2024, SA

11  Cernat also observed **ALONSO-MEDINA** working on **ALONSO-MEDINA's Vehicle #1**.  **ALONSO-**

12  **MEDINA** opened driver door of the **ALONSO-MEDINA's Vehicle #1** and then proceeded to open the

13  hood.  SA Cernat observed **ALONSO-MEDINA** working on **ALONSO-MEDINA's Vehicle #1** with

14  another unknown male.  Parked in the driveway of **ALONSO-MEDINA's Residence** was a 2015 white

15  Nissan Altima with California license plate 8ZSV733 (**ALONSO-MEDINA's Vehicle #2**).  **ALONSO-**

16  **MEDINA's Vehicle #2** returned registered to Fernanda Valeria Rodriguez at **ALONSO-MEDINA's**

17  **Residence**.  SA Cernat observed **ALONSO-MEDINA** open the passenger door of the **ALONSO-**

18  **MEDINA's Vehicle #2** and sit inside the vehicle.

19         63.     On December 10, 2024, your affiant conducted surveillance at **HIGUERA-ALDANA's**

20  **Residence #1**.  At 1245 hours, your affiant observed **HIGUERA-ALDANA's Vehicle # 1** backed into

21  the driveway of the residence.  **HIGUERA-ALDANA's Vehicle # 2** was parked on the street in front of

22  the residence facing westbound.  LOPEZ-PIMENTEL was standing in the driveway behind **HIGUERA-**

23  **ALDANA's Vehicle # 1**.  During the surveillance, your affiant observed LOPEZ-PIMENTEL and

24  **HIGUERA-ALDANA** walk freely from the area of the front door of **HIGUERA-ALDANA's**

25  **Residence # 1** to the driveway and to the vehicles on multiple occasions.  At 1259 hours, your affiant

26  observed **HIGUERA-ALDANA** and LOPEZ-PIMENTEL exit the area of the front door of the

27  residence and walk to the driveway.  Your affiant observed LOPEZ-PIMENTEL extend his hand

28  outward to **HIGUERA-ALDANA**.  **HIGUERA-ALDANA** appeared to receive something from

LOPEZ-PIMENTEL. **HIGUERA-ALDANA** walked down the driveway towards the driver door of **HIGUERA-ALDANA's Vehicle # 1**. Based on the quick exchange between LOPEZ-PIMENTEL and **HIGUERA-ALDANA,** as well as **HIGUERA-ALDANA**'s action of walking directly to the area of the front door of **HIGUERA-ALDANA's Vehicle # 1**, your affiant suspected the exchange may have been of vehicle keys. Due to another vehicle obstructing the view of **HIGUERA-ALDANA's Vehicle # 1,** your affiant was unable to determine if **HIGUERA-ALDANA** opened the door of **HIGUERA-ALDANA's Vehicle # 1**. **HIGUERA-ALDANA** walked to and from the area of the front door of **HIGUERA-ALDANA's Residence # 1** on several times and ultimately entered the driver seat of **HIGUERA-ALDANA's Vehicle # 2**. At 1306 hours, **HIGUERA-ALDANA's Vehicle # 2** (driven by **HIGUERA-ALDANA**) and **HIGUERA-ALDANA's Vehicle # 1** (driven by LOPEZ-PIMENTEL) departed the residence in tandem and turned northbound onto Pitt School Rd. in Dixon.

64. On December 11, 2024, TFO Ryken observed **HIGUERA-ALDANA's Vehicle # 1** driving eastbound on W Texas St. in Fairfield. Your affiant observed **HIGUERA-ALDANA's Vehicle #1** pull into the AutoZone parking lot located at 1440 W Texas St. TFO Ryken observed **HIGUERA-ALDANA's Vehicle # 1** back into a parking stall in front of the store. **HIGUERA-ALDANA** was driving **HIGUERA-ALDANA's Vehicle # 1** and LOPEZ-PIMENTEL was seated in the passenger seat.

65. During the week of December 9, 2024, your affiant tasked the CHS to reach out to **HIGUERA-ALDANA** to discuss a future methamphetamine purchase. The CHS reached out to **HIGUERA-ALDANA** via Instagram messenger. The CHS asked **HIGUERA-ALDANA** if he had any "waters." On December 13, 2024, **HIGUERA-ALDANA** replied to the CHS that he did.

66. On January 2, 2024, your affiant conducted surveillance of **HIGUERA-ALDANA** and of **HIGUERA-ALDANA's Vehicle #1**. Your affiant utilized the vehicle tracker affixed to **HIGUERA-ALDANA's Vehicle #1** (2:24-sw-1174) to assist with the surveillance. At approximately 2150 hours, your affiant observed **HIGUERA-ALDANA's Vehicle #1** in the drive through of In-N-Out Burger located at 720 Admiral Callaghan Ln. in Vallejo. Your affiant observed **HIGUERA-ALDANA** was the driver of **HIGUERA-ALDANA's Vehicle #1.** Your affiant, with assistance from other Detectives and the vehicle tracker, conducted rolling surveillance of **HIGUERA-ALDANA's Vehicle #1** throughout Solano County. On January 3, 2025, at approximately 0022 hours, your affiant observed **HIGUERA-**

1   ALDANA's **Vehicle #1** back into the driveway of **HIGUERA-ALDANA's Residence #1.**  Your affiant

2   observed **HIGUERA-ALDANA** exit **HIGUERA-ALDANA's Vehicle #1** and enter **HIGUERA-**

3   **ALDANA's Residence # 1.**

4           67.     On January 23, 2025, the CHS was tasked with reaching out to **HIGUERA-ALDANA**

5   regarding a future controlled methamphetamine purchase.  **HIGUERA-ALDANA** did not respond to

6   the CHS via telephone.  The CHS was tasked with reaching out to **HIGUERA-ALDANA** via

7   Instagram.  **HIGUERA-ALDANA** utilizes multiple Instagram accounts to post and advertise marijuana

8   products for sale.  The CHS reached out to **HIGUERA-ALDANA** on the Instagram account

9   "VTOWN.LOS200" as well as Instagram account "MONEYBAG_WRLDWIDE."  Shortly after the

10  CHS messaged both accounts, **HIGUERA-ALDANA** texted the CHS from phone number 707-853-

11  7958.  **HIGUERA-ALDANA** identified himself as "Los" via text message, indicating **HIGUERA-**

12  **ALDANA** was using a new telephone.  CHS inquired with **HIGUERA-ALDANA** whether he had any

13  "waters"—pounds of methamphetamine.  **HIGUERA-ALDANA** advised he would be available before

14  7PM on January 24, 2025.  **HIGUERA-ALDANA** told the CHS he no longer used 806 Sheridan St. in

15  Vallejo, but he had a new location in Vallejo by the Walgreens on Springs Rd.

16          68.     Your affiant knew 301 Avian Dr., apartment F32, in Vallejo (**HIGUERA-ALDANA's**

17  **Residence #2**) was an associated address to **HIGUERA-ALDANA**.  **HIGUERA-ALDANA** was

18  followed on surveillance to the area of **HIGUERA-ALDANA's Residence #2** following the first

19  controlled buy of a quarter pound of cocaine from **ALONSO-MEDINA**.  Further, your affiant had

20  located family or associates to **HIGUERA-ALDANA** who resided at **HIGUERA-ALDANA's**

21  **Residence #2** through open source database checks as well as local Solano County Law Enforcement

22  databases.  Lastly, your affiant had observed vehicle tracker data from **HIGUERA-ALDANA's** vehicles

23  plot in the area of **HIGUERA-ALDANA's Residence #2** on multiple occasions.  Your affiant and CHP

24  investigator Eric Hulbert previously conducted a vehicle tracker swap on **HIGUERA-ALDANA's**

25  **Vehicle #2** in the 301 Avian Dr. parking lot**.**  Your affiant had also observed vehicle tracker data of

26  **HIGUERA-ALDANA's** vehicles GPS plot in the vicinity of the Walgreens parking lot which is located

27  across the street from the 301 Avian Dr. apartments.  Based on these facts and circumstances, your

28  affiant believed **HIGUERA-ALDANA** may have been utilizing **HIGUERA-ALDANA's Residence #2**

1  to aid and assist in his drug trafficking business.

2

3  ***Controlled buy of one pound of methamphetamine from HIGUERA-ALDANA***

4          69.     On January 24, 2025, SCVCTF through the CHS conducted a controlled buy/walk

5  operation from **HIGUERA-ALDANA**.  At approximately 0800 hours, your affiant conduced spot check

6  surveillance of **HIGUERA-ALDANA's Residence # 1**.  Your affiant observed a gray 2017 Nissan

7  Altima with California license plate 9RKA797 (**HIGUERA-ALDANA's Vehicle #3)** parked in front of

8  **HIGUERA-ALDANA's Residence # 2**.  A record check of **HIGUERA-ALDANA's Vehicle #3**

9  returned as registered to **HIGUERA-ALDANA** at 1901 Capitola Way in Fairfield.

10         70.     At 0915 hours, **HIGUERA-ALDANA's Vehicle #3** was captured on FLOCK ALPR on

11  Pitt School Rd., northbound at Stratford Ave. in Dixon.

12         71.     At 0944 hours, **HIGUERA-ALDANA's Vehicle #3** was captured on FLOCK ALPR on

13  Tennessee St. eastbound at Humboldt St. in Vallejo.

14         72.     At 1115 hours, TFO Shane Raftery set up fixed surveillance of **HIGUERA-ALDANA's**

15  **Residence #2.**

16         73.     At 1141 hours, **HIGUERA-ALDANA's Vehicle #3** was captured on FLOCK ALPR on

17  Pitt School Rd. southbound at Stratford Ave. in Dixon.

18         74.     At 1213 hours, TFO Ryken observed **HIGUERA-ALDANA's Vehicle #3**, parked in

19  front of **HIGUERA-ALDANA's Residence #1**.  In the driveway of the residence was a red Nissan

20  Altima with California license plate 9RKA793 (**HIGUERA-ALDANA's Vehicle #4**).  **HIGUERA-**

21  **ALDANA's Vehicle #4** was backed into the driveway and did not have a front license plate.

22         75.     On the street in front of the residence was **HIGUERA-ALDANA's Vehicle #1** with a

23  black flatbed trailer with California license plate 4VB4098 attached to the hitch.  Parked behind

24  **HIGUERA-ALDNA's Vehicle #1** was a white Toyota sedan with California license plate 8URZ360.  A

25  record check of **HIGUERA-ALDANA's Vehicle #4** returned as registered to Elsa Maldonado at 533

26  Coot Ln., Suisun City, CA.  Your affiant conducted prior surveillance of 533 Coot Ln. in Suisun City on

27  December 11, 2025.  During the surveillance, your affiant observed **HIGUERA-ALDANA** and

28  LOPEZ-PIMENTEL working on a red sedan with no front license plate in the driveway of the residence.

1    HIGUERA-ALDANA and LOPEZ-PIMENTEL appeared to be cleaning or detailing the red sedan.

2    During this surveillance, your affiant observed **HIGUERA-ALDANA** leaning into the passenger

3    compartment of the red sedan.  Your affiant believed **HIGUERA-ALDANA's Vehicle #4** was the same

4    red sedan observed during the surveillance of 533 Coot Ln.

5    76.    At 1216 hours, the CHS was instructed to call **HIGUERA-ALDANA** and order four

6    pounds of methamphetamine.  The CHS reported that the CHS spoke with **HIGUERA-ALDANA**.  The

7    CHS reported that **HIGUERA-ALDANA** had one pound of methamphetamine available.  **HIGUERA-**

8    **ALDANA** advised the CHS he dropped of five pounds of methamphetamine to someone else earlier in

9    the day.  **HIGUERA-ALDANA** also advised he had previously given another two pounds to another

10   individual to "move" for him.  **HIGUERA-ALDANA** advised the CHS that he was going to call the

11   unknown individual to see if he could get the two pounds back for the CHS.  As previously observed on

12   FLOCK LPR cameras, **HIGUERA-ALDANA's Vehicle #3** was observed at **HIGUERA-ALDANA's**

13   **Residence #1** in the morning hours.  **HIGUERA-ALDANA's Vehicle #3** then left the residence and

14   was captured on FLOCK ALPR cameras heading towards the area of Avian Dr. on Tennessee St.

15   **HIGUERA-ALDANA's Vehicle #3** then returned to Dixon.  This activity was consistent with CHS

16   reporting that **HIGUERA-ALDANA** advised he delivered 5 pounds earlier in the day.  The following is

17   a timeline of events on the day of the controlled buy.  All times are approximate.

18   77.    At 1252 hours, LOPEZ-PIMENTEL left the driveway in **HIGUERA-ALDANA's**

19   **Vehicle #4.**

20   78.    Between 1255 hours and 1315 hours, **HIGUERA-ALDANA** was seen walking from the

21   area of the front door of **HIGUERA-ALDANA's Residence #1** multiple times.  **HIGUERA-ALDANA**

22   placed a white bag and a light-colored duffle bag into **HIGUERA-ALDANA's Vehicle #3** on two

23   occasions.  **HIGUERA-ALDANA** departed **HIGUERA-ALDANA's Residence #1** in **HIGUERA-**

24   **ALDANA's Vehicle #3.**

25   79.    Between 1315 hours and 1339 hours, rolling surveillance was conducted on **HIGUERA-**

26   **ALDANA's Vehicle #3**.  **HIGUERA-ALDANA** stopped briefly in front of 2410 Sunrise Dr. in

27   Fairfield.  An unknown individual, possibly a female was observed exiting the residence.

28   80.    Between 1342 hours and 1351 hours, **HIGUERA-ALDANA** drove **HIGUERA-**

**ALDANA's Vehicle #3** through Fairfield into Suisun City where it parked at the U.S. Post Office located at 325 Merganser Dr. in Suisun City.

81.    At 1416 hours, the CHS reported that **HIGUERA-ALDANA** advised he was unable to source the remaining three pounds of methamphetamine and he only had the original one pound available.  **HIGUERA-ALDANA** advised he could get the rest on Sunday.  **HIGUERA-ALDANA** exited the Post Office and drove to Vallejo, eventually arriving at **HIGUERA-ALDANA's Residence #2** at 1441 hours.  TFO Raftery observed an unknown young HMA exit the door of the apartment and open the garage roll up door.  **HIGUERA-ALDANA** entered the garage with the HMA and the door closed behind them.

82.    At 1445 hours, **HIGUERA-ALDANA** told the CHS to meet him at the Walgreens parking lot located at 2647 Springs Rd.  At 1451 hours, **HIGUERA-ALDANA** left **HIGUERA-ALDANA's Residence #1** in **HIUGERA-ALDANA's Vehicle #3** and arrived at the Walgreens parking lot at 1452 hours.

83.    SA Cernat and your affiant met the CHS at a pre-determined meeting location.  The CHS and the CHS' vehicle were searched for contraband with negative results.  The CHS was provided $1,000 of FBI buy funds.

84.    The CHS met with **HIGUERA-ALDANA** in the Walgreens parking lot.  **HIGUERA-ALDANA** placed one pound of methamphetamine in the CHS vehicle in exchange for the $1,000. Following the controlled buy, SA Cernat and your affiant recovered the one pound of suspected methamphetamine, which was provided to the CHS by **HIGUERA-ALDANA**.  The CHS and the CHS' vehicle were searched for unauthorized contraband with negative results.

1
2
3
4
5
6
7
8
9
10
11
12
13



PHOTO OF SUSPECTED METHAMPHETAMINE RECOVERED FROM 01/24/25 BUY/WALK.

14
15
16
17

85.     At 1505 hours, **HIGUERA-ALDANA** returned to **HIGUERA-ALDANA's Residence #2**. A young HMA from the residence entered **HIGUERA-ALDANA's Vehicle #3**. **HIGUERA-ALDANA's Vehicle #3** departed the location and surveillance was terminated.

18
19
20
21

86.     On February 3, 2025, the CHS reported **ALONSO-MEDINA** had an AK-47 style firearm for sale for $1,200. **ALONSO-MEDINA** had shown a photo of the AK-47 to the CHS. The photo was on **ALONSO-MEDINA's** phone with number 707-450-6853. The CHS described the AK-47 as having a wooden stock, wooden grip, with a 100 round drum magazine.

22
23
24
25

87.     On February 4, 2024, the CHS called **ALONSO-MEDINA** via telephone. **ALONSO-MEDINA** told the CHS the AK-47 had been sold. **ALONSO-MEDINA** advised the CHS that a Glock firearm was for sale. **ALONSO-MEDINA** was going to reach out to the person who had the Glock and get back to the CHS regarding price and availability.

26
27
28

88.     On February 7, 2025, at approximately 0811 hours, your affiant conducted a spot check surveillance of **HIGUERA-ALDANA's Residence #1**. Your affiant observed a gray 2019 Chevy Spark with California license place 9RMY010 ("**HIGUERA-ALDANA's Vehicle #4**") parked on the street in

1  front of the residence.  A record check returned that **HIGUERA-ALDANA's Vehicle #4** was registered

2  to Samantha Ochoa Sanchez at 706 Magnolia Ct. in Fairfield.

3        89.    On February 18, 2025, SA Cernat and your affiant deployed a video surveillance drop

4  vehicle on W F St. in Dixon.  The surveillance vehicle was equipped with cameras and a digital

5  recording system which was positioned to capture activity coming and going from **HIGUERA-**

6  **ALDANA's Residence #1**.  **HIGUERA-ALDANA's Vehicle #4** was parked on the street in front of

7  **HIGUERA-ALDANA's Residence #1** during the deployment of the surveillance vehicle.

8        90.    On February 19, 2025, SA Cernat live monitored the video surveillance footage being

9  captured from the surveillance vehicle.  At approximately 0938 hours, **HIGUERA-ALDANA** arrived at

10  **HIGUERA-ALDANA's Residence #1** in **HIGUERA-ALDANA's Vehicle #1.  HIGUERA-**

11  **ALDANA** parked **HIGUERA-ALDANA's Vehicle #1** along the curb line in front of the residence**.**

12  **HIGUERA-ALDANA** then walked towards the area of the front door.  **HIGUERA-ALDANA** returned

13  to the curb line and entered **HIGUERA-ALDANA's Vehicle #4.  HIGUERA-ALDANA** departed

14  towards Pitt School Rd. in **HIGUERA-ALDANA's Vehicle #4** and out of view.

15          ***Training and Experience Regarding Drug/Firearm Trafficking and Drug/Firearms***

16                                    ***Traffickers***

17        91.    As a result of my training and experience, I know that the traffickers who deal in

18  controlled substances and firearms, or those that assist in that venture, maintain and tend to retain

19  accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended,

20  along with records tending to indicate the identity of the co-conspirators.  These records may be kept on

21  paper or contained in memory calculators, cell phones, tablets and/or computers.  It is also my

22  experience that these traffickers tend to keep these accounts and records in their residences and in the

23  areas under their control.  It is my training and experience that in the case of drug dealers, evidence is

24  likely to be found where the dealers live.  It is also my training and experience that where criminal

25  activity is long term or on-going, equipment or records of the crime will be kept for some period of time.

26        92.    I have learned that large-scale drug and firearms traffickers often have on hand large

27  amounts of United States currency in order to maintain and finance their ongoing business.  It has been

28  my experience that drug traffickers often keep large sums of currency, caches of drugs, financial

instruments, precious metals, jewelry, automobiles, and other items of value and/or proceeds of drug transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

93.     In my experience, drug and firearm traffickers commonly have in their possession, that is on their person, at their residence, and their vehicles, and in the areas under their control, firearms, included but not limited to handguns, pistols, revolvers, shotguns, rifles, machine guns, and other weapons.  Such firearms are used by criminals to protect their illicit trafficking operations, and themselves against law enforcement and others because the illicit drug and firearms trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Further, I know drug traffickers will sometimes trade controlled substance for various items.  Firearms are a common item which are acquired by traffickers through the trade of their controlled substances.

94.     In my experience, traffickers commonly have in their possession, that is on their person, at their residence, and in their vehicles, and in the areas under their control and which they have free and ready access to drugs and firearms, which they intend to distribute.  It is my experience that these traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

95.     In my experience, traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product.  Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

96.     In my experience, traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

97.     In my experience, drug and firearm traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities.  It has also been my experience that traffickers will also utilize the vehicles as locations in which to store controlled

1  substances and firearms prior to distribution.  Through my training and experience, I have observed that

2  traffickers will often utilize vehicles registered in the names of individuals other than themselves in an

3  effort to avoid detection by law enforcement.

4      98.    In addition, drug and gun traffickers often tend to attempt to legitimize their assets by

5  establishing domestic and foreign businesses, by creating shell corporations, by utilizing foreign bank

6  haven countries and attorneys specializing in drafting and establishing such entities employed to

7  "launder" proceeds derived from the distribution of controlled substances.

8      99.    Individuals involved in the distribution of guns and drugs often make, or cause to be

9  made, pictures videos, movies, compact discs, or other such items which are or contain photographic or

10 digital images in order to memorialize their narcotics distribution, use, possession, or any other activities

11 surrounding their trafficking activities, and that such items often identify co-conspirators in their

12 trafficking activities.

13     100.    It has been my experience in the past, and particularly in this case, that when suspects use

14 mobile phones to communicate with cooperating individuals or undercover agents to set up their illegal

15 transactions, records relating to these activities will be found stored in the cellular telephone.

16     101.    I know that traffickers use mobile phones to communicate with one another, either by

17 voice or text message.  Mobile phones preserve in their memory a history of incoming, outgoing, and

18 missed calls, which can lead to evidence of the phone numbers of other traffickers and the dates and

19 times that they and/or the mobile phone user dialed one another's telephones.  Mobile phones also

20 contain in their memory a telephone book.  This allows the user to store telephone numbers and other

21 contact information; the information stored in a phone used by a trafficker is evidence of the association

22 of the trafficker, some of which is related to his or her illegal business.  Mobile phones also have a voice

23 mail function that allows caller to leave a message when the user does not answer.  Traffickers

24 sometimes leave voice messages for each other, and this is evidence both of their mutual association and

25 possibly their joint criminal activity.  Mobile phones can also contain other user-entered data files such

26 as to-do lists, which can provide evidence of crime when used by a trafficker.  Mobile phones can also

27 contain photographic data files, which can be evidence of criminal activity when the user was a

28 trafficker who took pictures of evidence of crime.

102.     As described in the Attachments A-1 through A-11, this affidavit seeks permission to search and seize things that are related to the drug/firearms-trafficking activities between **ALONSO-MEDINA, HIGUERA-ALDANA**, and their co-conspirators and accomplices, in whatever form such things are stored.  Based on my training and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensic tools.  Similarly, things that have been viewed via the Internet, are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.

103.     It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in the respective Attachment B are items most often associated with the distribution of controlled substances and firearms as well as the proceeds from such illegal operations.

104.     Individuals involved in drug trafficking also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Individuals involved in firearm trafficking also maintain ammunition, firearm parts, firearm accessories, and holsters.

105.     Your affiant's training and experience indicates most street gang members are known by street names or monikers to their fellow gang members, and they frequently write their gang name, their street names or monikers of their associates on walls, furniture, miscellaneous items or papers, both within and on their residence and within and on their vehicles.  Many gang members keep photographs and photographic albums either digital or physical that depict: themselves and fellow gang members posing and displaying hand gang signs, which indicates gang identity or affiliation; gang members of associates posing with weapons which are often used for criminal activities; gang members or associates posing beside vehicles, which are occasionally used during the commission of crimes; or gang members or associates posing at locations which are known to be specific gang hangouts.  Gang members occasionally maintain scrapbooks or newspaper articles describing crimes committed by or against their gang.

106.     Gang members and associates also frequently maintain the current phone numbers or addresses of fellow gang members or associates.  It is also my experience that gang paraphernalia, gang

related or other weapon paraphernalia, as described above is frequently maintained as such is necessary and incident to the possession and use of such weapons. Furthermore, such evidence of gang membership and clothing are not normally disposed of and therefore are likely to be found at the location to be searched. It is also my opinion that evidence of gang membership or affiliation with a street gang is important as it may suggest or confirm motive for the commission of the crime in the instant case and it may provide evidence identifying other persons who have knowledge of or are involved in the commission of the crime in the instant case, or may corroborate information given by other witnesses.

107. Based upon your affiant's knowledge, experience, and training in gang investigations, and the training and experience of other law enforcement officers with whom I have had discussions, your affiant knows there are certain characteristics, traits, and methodologies common among gangs and gang members. Your affiant knows that criminal street gangs are generally defined as an ongoing organization of three or more persons with a common name, or identifying mark or symbol, having as one of its primary activities the commission of specified crimes, and whose members individually or collectively engage in criminal activity. Your affiant knows that gang members also identify themselves with colors, identifying marks, or symbols. These colors, identifying marks, or symbols are used by gang members to readily identify each other or identify unknown members from different areas. The symbols used by gangs are often commonly found symbols such as sports team logos, product logos, or hand signs which indicate gang identity or affiliation. Your affiant is also aware that gang members often possess written documents related to gang membership. These documents often include information about gang membership such as a gang roster of members, monikers, and graffiti regarding the writer's gang. Quite often gang members keep written correspondence directed to or received from gang members in-custody intended to keep members appraised of what is going on with the gang and its enemies and allies.

108. Therefore, I am requesting authority to seize all items listed in Attachment B to this affidavit and incorporated here by reference.

**CONCLUSION**

109.    I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in each respective Attachment A and seize the items described in each respective Attachment B.

**REQUEST FOR SEALING**

110.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

 /s/ Dalton Ryken
TFO Dalton Ryken
FBI

Subscribed and sworn to me via telephone on:   February 24, 2025

The Honorable Jeremy D. Peterson
UNITED STATES MAGISTRATE JUDGE

/s/ R. Alex Cardenas
Approved as to form by AUSA R. ALEX CARDENAS

AFFIDAVIT                                    36